136 So.2d 907

**Lula B. SMITH**

v.

**STATE.**

5 Div. 593.

Court of Appeals of Alabama.
Aug. 22, 1961.

Rehearing Denied Dec. 12, 1961.

Leon Victor McIntyre, pro se.

MacDonald Gallion, Atty. Gen., and John G. Bookout, Asst. Atty. Gen., for the State.

488

Russell & Russell, Tuskegee, for appellant.

MacDonald Gallion, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

CATES, Judge.

This is an appeal from a nonjury conviction of possessing lottery paraphernalia contrary to Act No. 799 of September 11, 1951 (Acts 1951, p. 1398).

■ The sheriff seized on the defendant's person a yellow rectangular slip (Exhibit 1) bearing:

"New
"Gold Field
9956
26
58
71
67
11
74
45
24
21
20
16
47"

Also he took a pad (Exhibit 2) with numbers put on the sheets by pencil, carbon and printing.

An expert witness identified Exhibit 1 as advertising a numbers game. He testified that Exhibit 2 was a writer's book, lottery paraphernalia.

Act No. 799 does not make the mere possession of lottery paraphernalia an offense. The person charged must also be shown (1) within three years last past and either (2) to be (or have been) actually engaged in, etc., the (a) setting up, (b) conducting or (c) operation of a numbers game or other like lottery, or (3) to be (or have been) an employee of a person meeting the definition of (2).

The evidence as to the writer's book from which the court could have inferred that the defendant was soliciting, collecting and—if ever required—paying off and within the three years before complaint was sufficient.

It was immaterial to the issues for the State to ask the sheriff if a lottery ("a bug racket") was operating in Macon County, Alabama. However, objection came after the answer and the grounds specified were not apt.

■ Under our view the location of the operation of the lottery is not confined to the venue of the trial for possessing the paraphernalia. If it can be shown that the possessor in the past three years had (as more precisely put in the Act) anything to do with, or worked for the operator of, such a lottery, whether in Hong Kong, Timbuctoo or anywhere else, then conditions (1) and (2) or (3) above are met.

The judgment with its sentence to payment of $500 fine is due to be

Affirmed.

### On Application for Rehearing

We are glad to honor the appellant's request that we elaborate on the evidence.

Sheriff Hornsby testified in part:

"I found her in the school laundry, and I brought her outside and searched her person, and only found one object on her person, in her purse.

"Q. All right, what was that? A. That was this yellow piece of paper. [Exhibit 1, supra.]

*   *   *   *   *   *

"Then I asked her to accompany us to her house where we made a search for gambling paraphernalia. This is what we found there, after we got there, some of what we found.

"Q. (By Mr. Young) I will ask you if you found this pad [Exhibit 2] here in her house? A. I did."

Exhibits 1 and 2 were received without objection.

Mr. Grover C. Johnson, a city detective from Phenix City, whose qualifications as an expert "as far as lottery operation and paraphernalia [were] concerned" were admitted by defense counsel, testified in part:

"Q. I will ask you to look at State's Exhibit No. 2 there, and tell the court what that is, please, sir. A. That's a lottery book.

"Q. Lottery book? A. One they use to write the numbers in, how much they play and who the player was.

"Q. Well, who usually retains this book in their possession, the player or the peddler, or whatever you call it? A. The writer.

"Q. The writer? That's the numbers man? A. Yes, sir.

"Q. Or woman? A. Yes, sir.

"Q. All right, this is a lottery book? A. Yes, sir.

"Q. (By Mr. Young) And I will ask you to read on the—does this first one show a date of October the 28th, 1959, the first page of it? A. Yes, sir.

"Q. Does it also show in there October 29th, 1959, some of the—one of the places? A. Yes, sir. ·

"Q. Does it also show October the 30th, 1959? A. Yes sir.

"Q. Does it also show October the 31st, 1959? A. Yes, sir.

"Q. I will ask you to examine State's Exhibit Number 1, and tell the court what that is, please, sir. A. This here is what they use to pick their numbers from. They look at this and pick one number here maybe, or both these numbers or one of these. They've got to have three numbers to play it with. They'll pick maybe 287 or 686.

"Q. Does the writer usually carry one of these with them? A. Yes, sir."

Cross-examination of Mr. Johnson brought out:

"Q. (By Mr. Russell) Mr. Johnson, I show you State's Exhibit 1. Now that particular piece of paper there, couldn't that have been found on a player, the person that was playing the lottery? A. Could have been found on a player or a writer.

"Q. (By Mr. Russell) Couldn't it have been found on a person that wasn't a player or a writer? Isn't that what they use for advertising? A. Well, yes—it could have been used by somebody that was passing it out to pick them up or something.

"Q. Yes, sir. It would be just as likely to be found on a player as a writer, wouldn't it? A. Yes, sir.

"Q. All right, sir. Now, I show you this dream book that is in State's Exhibit 3. That would probably be in the hands of a player, is that right? A. It could be in either one.

"Q. It could be in either one? It would be likely to be in the hands of a player, wouldn't it? A. Not necessarily. They either one could have it.

"Q. Well, what would the player— what would the writer use that book for? A. Well, whenever somebody come to their house they pick the numbers out of the book.

"Q. Well, the book would be used primarily to pick numbers from? A. Yes, sir.

"Q. To play with, is that right? A. Well, yes.

\* \* \* \* \* \*

"Q. (By Mr. Russell) Mr. Johnson, this Exhibit Number 2. Now, if a person played the lottery a whole lot, wouldn't it be possible for him to have one of these books to keep up with his numbers? A. No, they don't let the writer—the player have a book like that.

\* \* \* \* \* \*

"Q. They could have done that in Tuskegee, couldn't they? A. They could have in Tuskegee, but they don't usually do it.

"Q. They don't do it in Phenix City? A. No, sir.

"Q. You don't know what they do in Phenix—you don't know what they do in Tuskegee? A. No.

"Q. Would it have been possible that the writer could have left that book somewhere? You just say that's the writer's book. A. Well, I say they don't usually leave them. That's the record. They got to keep up with what was played that day, and who played that number.

"Q. Of course, there are several pages in this book, but how many—in other words, if I came to you and you were writing it and you wrote me a number in this book, how many copies would you make of that? A. Well, they make a yellow copy and give that to the headquarters. This copy here stays in there, and the white one is usually tore out and give to the—

"Q. Given to the player? A. To the player.

"Q. In other words, the yellow sheet of paper is a thin, onion skin piece of paper? A. No, a thicker sheet.

"Q. That's what I say, a yellow piece of paper and then this onion skin piece of paper and a white piece? A. Yes, sir.

"Q. And the writer uses that book and makes three copies of everything that he sells, is that right? A. Carbon paper in between each one.

"Q. Carbon paper in between. And wouldn't it be possible for a player to have one of these books and write his own numbers and give those two copies to the writer? Wouldn't it be possible to run a lottery like that? A. It's possible.

"Q. Could not you run or operate a lottery like that? A. That's not the way they operate it in Phenix City.

"Q. Yes, sir, that's not the way they operate it in Phenix City; but wouldn't it be possible to operate a lottery like that? A. I don't know how they operate it over here.

"Q. I realize that, but I say wouldn't it be possible to operate a lottery like that? A. I don't know. Probably could be.

"Q. (By Mr. Russell) Could be, couldn't it? A. No, I don't know."

■ The statute reads in part:

" * * * To constitute the offense created by this section it shall not be necessary that such lottery paraphernalia be actually used, or actually be in use or is actually to be used in the operation of such games. It shall not be a defense to the charge of possessing such lottery paraphernalia that it has not actually been used or was not then being used, or was not intended to be used in the operation or in connection with the operation of any such game. Expert testimony shall be admissible to show that such lottery paraphernalia was customarily and usually used in the operation of such a numbers (or number) game or policy game, and expert testimony shall also be admissible to show the contrary.

"Section 2. The provisions of this Act shall not be construed to make unlawful the possession of articles or paraphernalia not commonly used in the conduct of any such numbers (or number) game or policy game." Act No. 799, supra.

We hold that proof of an operating lottery, i. e., evidenced by proof of a prize, the element of chance, and a consideration is unnecessary to show either (1) that the defendant has been connected with a "numbers game" *in operation* or (2) the paraphernalia be in use. Clearly, this second conclusion is directly deduced from the quoted statute.

■ As to proving the defendant comes under § 1 of the Act which reads,

"Any person who is or has been within three years next preceding actually engaged in or connected with the setting up, conducting or operation of any form or type of lottery commonly known as a numbers (or number) game or policy game, or who is or has been an employee of a person or persons who are or have been within three years next preceding engaged in setting up, conducting, or operating any such game or games * * *."

we consider the expression "setting up" covers the preparatory action such as this defendant's issuing receipts of the kind shown to players.

■ Exhibit 2, the "writer's book," purports to reflect 49 or 50 transactions running from October 28 through October 31, 1959, and showing payment of amounts from twelve cents to $4.20. Thus the 29th receipt shows:

"M_____ Oct _____ Date _____ 29 _____ 1959

B–11

309–9–2
110–2–7
815–8–6
333–2–12
000–2–3
475–4–10·

| Book No. | Sales No. | Total Sales |
|---|---|---|
| 14871 – | 29 | 40 " |

A yellow original sheet—for the operator—has been torn out leaving the above text to appear on an onion skin paper sheet, by means of a carbon impression. The last sheet (of the three in the 29th series) is a cheap pulp paper with the legend (again from carbon paper) set forth above.

The wording, "M," "Date," "19," "Book No.," "Sales No.," "Total Sales," has been printed in red ink on this last sheet. On both it and the onion skin sheet, the numbers "14871–29" appear. All sheets in the book bear the suffix number "14871–"; the first being "14871–1" and the last "14871–50." No. 48 is incomplete and has all three sheets.

This book permitted the inference, when considered in the light of the testimony, that the defendant was collecting money (consideration) which was put in varying amounts against certain numbers which, if drawn by chance, presumably (from the fact that player, writer and operator used triplicate receipts) would obligate the entrepreneur to pay a valuable prize. See

Clark v. State, 38 Ala.App. 78, 80 So.2d 308.

Thus transaction No. 48 being incomplete is no evidence of "setting up" a lottery by way of the numbers game. But the other 49 were sufficient to support a finding of guilt to the required degree.

Application overruled.